**ANSTINE v. HERBERT, Federal Prohibition Administrator, et al.**

District Court, D. Maryland. December 22, 1928.

No. 1420.

J. Abner Sayler, of Baltimore, Md., for plaintiff.

A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, District Judge. This is a proceeding brought under title 2, section 9, of the National Prohibition Act (27 USCA § 21) to review the revocation of a permit issued to the plaintiff, a licensed pharmacist in Baltimore, to fill physicians' prescriptions for liquor, and also to abate taxes and penalties assessed against the plaintiff pursuant to the Revenue Acts of 1918 (40 Stat. 1057) and 1926 (44 Stat. 9), and the National Prohibition Act (27 USCA).

Section 9 of the act provides that the Commissioner or his agent may, upon complaint or if the Commissioner himself has reason to believe that any one holding a permit is not in good faith conforming to the provisions of the act, cite such person to appear before him and to show cause why his permit should not be revoked. The section further provides that: "If it be found that such person has been guilty of willfully violating any such laws, as charged, or has not in good faith conformed to the provisions of this act, such permit shall be revoked, and no permit shall be granted to such person within one year thereafter. Should the permit be revoked by the Commissioner the permittee may have a review of his decision before a court of equity in the manner provided in section 5 hereof. During the pendency of such action such permit shall be temporarily revoked." Section 5 (27 USCA § 14), in turn provides that "the court may affirm, modify, or reverse the finding of the Commissioner as the facts and law of the case may warrant."

Plaintiff contends that at the hearing, which was held before the local prohibition administrator pursuant to the provisions of section 9, there was no evidence produced showing that the plaintiff was guilty of willfully violating the law, or that he did not in good faith conform to its provisions, and that, therefore, the revocation of his permit was unauthorized and an abuse of the local administrator's authority.

Summarized, the basis of the citation to plaintiff is that he unlawfully conspired with Dr. Stansbury, a Baltimore physician, to buy, and did buy for $40, from such physician, 20 prescriptions for whisky in viola-

tion of the act, and that he unlawfully sold whisky on these prescriptions to parties not entitled to purchase the same. The local administrator found that the foregoing charges had been substantiated, and revoked the permit.

Upon the hearing for review of the local administrator's finding, which was treated as a hearing de novo, a transcript of the testimony taken at the revocation hearing was submitted by agreement of the parties. This comprised the testimony of five witnesses for the government, including the physician, Stansbury; also the testimony of plaintiff, as well as of five other witnesses on his behalf. The plaintiff himself was reheard, and in addition five witnesses, whose testimony was not taken at the revocation hearing, were heard on behalf of the plaintiff. No additional testimony was presented to the court on behalf of the government.

The substance of the government's testimony is that on January 17, 1928, as a result of an investigation of the permit records of Dr. Stansbury, certain irregularities were found, following which Dr. Stansbury stated that he had sold 20 prescriptions to plaintiff between December 21 and 31, 1927, and he executed an affidavit to this effect. Plaintiff Anstine's records disclosed that 14 prescriptions issued by Dr. Stansbury between the foregoing dates had either been filled by the plaintiff himself, or he had permitted one or both of his associate pharmacists to fill them, on presentation at his pharmacy; the total amount thus sold on these prescriptions being 14 pints, one pint to each prescription. All of the alleged patients of Dr. Stansbury named in the 14 prescriptions were found to be fictitious. He had initialed 10 of these prescriptions with the letter "A," so that, as he explained, he might use the bogus names again when dealing with the plaintiff. Under the regulations, physicians' prescription blanks bear serial numbers and are required to be used in order, but in the present instance the 14 prescriptions so identified were taken from different parts of Dr. Stansbury's prescription book, ranging from No. 3 to No. 73. It further appeared that, of two or more prescriptions filled on a given day, the numbers were not only not consecutive, but widely apart. For example, on December 26th Nos. 28 and 73, and on December 25th, Nos. 24 and 65 were filled. Another pharmacist, to whom Dr. Stansbury had also sworn he had sold prescriptions, denied the purchases, but admitted that his own permit had been revoked. Dr. Stansbury claimed that, some six years ago, the plaintiff had requested him to make up a shortage of some 15 whisky prescriptions, but there is no proof of this, or of any irregularities in other instances on the part of plaintiff. The plaintiff on his part claimed Dr. Stansbury had endeavored to borrow money from him, and that, upon being unable to do so, had become embittered.

The plaintiff testified that he had no definite recollection of any of the persons who presented themselves with the prescriptions, and for whom the prescriptions were filled. To the same effect was the testimony of Anstine's two associates. It further appears that, while Anstine canceled the 14 prescriptions personally, he did not personally fill all of them. He also admitted that it was not uncommon for him to deliver the liquor by messenger at the address of the patient named on the prescription, instead of delivering it at the pharmacy to the person presenting the prescription. These practices were admittedly contrary to the regulations promulgated by the Bureau of Prohibition governing permits for the prescribing and dispensing of liquor for medicinal purposes, but the plaintiff defended his conduct on the ground that he did a large business of the variety common to a popular drug store in a large center, and that frequently pressure in waiting upon customers required a division of labor between himself and his associates, with respect to prescriptions. An additional irregularity is admitted to have occurred, in that the name of one of the plaintiff's associate pharmacists, who filled one or more of the prescriptions in question, was not actually upon the plaintiff's permit in effect at the time; but the testimony of the plaintiff is uncontradicted to the effect that such person had been substituted for another associate, no longer connected with him, whose name appeared on the permit, and that an application had been made for the formal approval of such substitution.

Dr. Stansbury's claim of illegal sale of the prescriptions to the plaintiff was totally uncorroborated, and he died prior to the hearing before this court. It was admitted that his reputation was exceedingly bad, and that he had previously been involved in fraudulent transactions, although at the time in question he had a permit to issue prescriptions. On the other hand, the good character of plaintiff Anstine was testified to by several reputable pharmacists and physicians, and uncontradicted.

The court concludes that the administrator was entirely unjustified on the evidence presented in revoking plaintiff's license, because the evidence neither indicates, nor tends to indicate, that the plaintiff willfully violated any provision of the Prohibition Act, or was in any respect guilty of bad faith. The action of the administrator appears to have been based primarily upon the uncorroborated testimony of Dr. Stansbury, admittedly a person of bad character. The court is unwilling, in the absence of evidence of a more reliable character, to fasten guilt upon the plaintiff. It is true that, independently of Stansbury's testimony, the irregularities occurring in the plaintiff's method of handling prescriptions prima facie required explanation. Such explanation, however, appears to have been supplied, and in any event, viewing these irregularities in their aspect least favorable to the plaintiff, the most that can be said is that they indicate some negligence, not bad faith.

There is nothing in the Prohibition Act which makes it the duty of a pharmacist to do more than satisfy himself that a prescription as presented is prima facie regular upon its face. The result of the findings of the administrator is to rewrite the law, and to say to a pharmacist that he fills a prescription at his peril; in other words, that he must satisfy himself of the good faith of the physician issuing the same, even to the extent of actually identifying the patient named therein. Such requirement would be impracticable and unreasonable, and is not to be implied in the enforcement of the present law. This does not mean, however, that a situation may not arise which would render it incumbent upon the pharmacist to make some investigation before filling the prescription. Just when such a situation might arise it is unnecessary to decide here. It is not to be determined by the number of prescriptions presented in any one day, or given number of days, or by any other one circumstance. The fact that in the present case the serial numbers of the prescriptions were so divergent was not in itself sufficient cause to impose upon the pharmacist the duty of investigating the reason for the same; certainly not when the total number of prescriptions of this one physician which were presented during a period of 10 days was not inordinate.

Under the department's regulations governing permits, a physician is allowed to have 100 blank prescription forms every 3 months. Conceivably, then, Dr. Stansbury might in good faith have written for various patients (provided he prescribe for no one patient more than the legal limit) many more than 14 in a 10-day period. The regulations require that prescriptions be filled within 3 days following their date of issuance. This was done. As a matter of fact, it appears that one of the plaintiff's associates filled the first prescription not in serial order, and thus it is highly probable and natural that the lack of sequence was not noticed. Nor is the fact that during the previous year or more prescriptions from this same physician had not been presented to the plaintiff with any such frequency sufficient, without more, to give rise to suspicion. The plaintiff had been conducting the same business for some 8 years, and no other irregularities were shown to have taken place. There is no proof that Dr. Stansbury's previous use of prescriptions was such as to put the plaintiff on his guard. The plaintiff filled prescriptions for some 50 or 60 physicians, sometimes as many as 4 or 5 prescriptions on one day for one physician. It is scarcely conceivable that under such circumstances the plaintiff would have staked his reputation and business upon the purchase, in such manner, of these few prescriptions. Certainly the same has not been proved to the satisfaction of the court.

While department rulings are not binding upon the court, it is significant to note that the local administrator has apparently transcended the very rule intended to control him, for section 1610 of Regulations 2, effective October 1, 1927, provides that "the filling of bogus prescriptions, or lack of care in scrutinizing or investigating prescriptions offered for filling, *tends* to show bad faith." (Italics inserted.) Note that no *conclusive* presumption of bad faith is attempted to be created.

Accordingly, the permit must be restored to the plaintiff, and the differential tax assessed against the plaintiff under section 600(a) of the Revenue Act of 1918 and section 900 of the Revenue Act of 1926 (26 USCA § 245), as well as the specific penalty assessed under section 35, title 2, of the National Prohibition Act (27 USCA § 52), must be abated. An order will be signed to this effect.